**FILED**
2014 Nov-10  AM 09:44
U.S. DISTRICT COURT
N.D. OF ALABAMA



IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
WESTERN DIVISION

| | | |
|---|---|---|
| WILLIAM M. SPEARMAN, et al., | ) | |
| | ) | |
| Plaintiffs; | ) | |
| | ) | |
| vs. | ) | 7:11-cv-03960-LSC |
| | ) | |
| WYNDHAM VACATION | ) | |
| RESORTS, INC., et al., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OF OPINION

Before the Court is Defendants Wyndham Vacation Resorts, Inc. and Wyndham Vacation Ownership's motion for summary judgment. (Doc. 78). Also pending is a motion to strike portions of the Plaintiffs' undisputed fact section and certain exhibits admitted in support of the Plaintiffs' response to Defendants' motion for summary judgment. (Doc. 129). For the reasons stated below, the motion for summary judgment is due to be granted in part and denied in part, while the motion to strike is due to be denied as moot.

I.      Facts[1]

Defendants Wyndham Vacation Resorts, Inc. and Wyndham Vacation Ownership (collectively "Wyndham") are one of the largest timeshare companies in the world.[2] Wyndham develops and sells vacation ownership interests, which are reflected by an allocation of "points" proportionate to each owner's interest. These points can be used to make reservations at various resorts.

Plaintiffs William M. Spearman ("Mr. Spearman") and Young-Rang Spearman ("Mrs. Spearman"), together with a trust created by the Spearmans known as the Spearman Family Trust ("Spearman Trust"), own approximately 15,600,000 Wyndham points. They are among the largest Wyndham point holders in the world and are Platinum VIPs, the highest level of a three-tiered VIP benefit program. Plaintiffs purchased some of their points directly from Wyndham, but accumulated most of their points through purchases from third-party owners.

Plaintiffs made an initial timeshare purchase from Defendants in 2001, but

---

[1] The facts set out in this opinion are gleaned from the parties' submissions of facts claimed to be undisputed, their respective responses to those submissions, and the Court's own examination of the evidentiary record. All reasonable doubts about the facts have been resolved in favor of the nonmoving party. *See Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002). These are the "facts" for summary judgment purposes only. They may not be the actual facts. *See Cox v. Adm'r U.S. Steel & Carnegie Pension Fund,* 17 F.3d 1386, 1400 (11th Cir. 1994).

[2]  Wyndham was formerly known as Fairfield Resorts, Inc. However, for ease of understanding this court will refer to the timeshare company as Wyndham throughout this opinion.

rescinded the contract because Mr. Spearman believed he had been tricked into making the purchase by the salesperson. After later discussing the possibility and mechanics of running a timeshare rental operation using Wyndham points, Mr. Spearman began to purchase Wyndham points from third parties in August of 2003.

Mr. Spearman made his first purchase directly from Defendants on September 4, 2003. The 2003 purchase was made from Wyndham salesman Stan Banks at the Fairfield Glade resort in Tennessee. While making the sale, Stan Banks represented to the Plaintiffs' that they could rent out their points; that they could make enough money renting their points to cover their expenses; that they could start a rental business using points; and that they could use Wyndham's systems to run their rental business. In 2005, the Plaintiffs' made another purchase of points directly from Wyndham, at which time the two Wyndham sales personnel involved in the sale made these same representations to the Plaintiffs. On February 16, 2006, another Wyndham sales person made these same representations to the Plaintiffs while making a sale of Wyndham points. The Plaintiffs' final purchase of points directly from Wyndham occurred on June 10, 2006, where the sales personnel again made the same representations to the Plaintiffs concerning the ability to rent points, run a rental business, and do so using Wyndham's systems. While they no longer purchased any points directly from Wyndham after this point, the Plaintiffs did continue to purchase

points from third parties. Plaintiffs' final purchase of Wyndham points of any kind came on April 18, 2011.

Wyndham has an internal sales compliance manual that establishes standards for sales presentations. That manual explicitly describes a variety of prohibited sales practices, including promoting the rental of points as a reason for purchasing additional timeshare units. The manual contained specific provisions stating that:

- Discussing the likelihood of an owner being able to rent the product or the amount an owner could expect to receive for the rental of the product is prohibited.

- Providing examples, third party experiences, opinions regarding the amount an owner could expect to receive, or indicating that owners typically receive a certain amount of money when renting their timeshare is prohibited.

- Suggesting that an owner can rent their timeshare to cover their maintenance fees or that an owner can pay for their purchase by renting out their timeshare is prohibited.

- Recommending or endorsing a particular rental company is prohibited.

(Doc. 123-3 at 3.[3])

Notwithstanding these prohibitions, Plaintiffs have introduced evidence to show that Wyndham sales personnel regularly promoted the potential income from the rental of points when encouraging customers to make purchases. This evidence includes the testimony of several former Wyndham employees who testified that, with encouragement from management, sales representatives would discuss the promise of rental income in "the thousands of dollars," (Doc. 123-4 at 26,) the likelihood of renting out properties, (Doc. 123-8 at 9,) success stories from other Wyndham owners who had used their points to rent out properties, (*Id.* at 18,) and the idea that rental income could offset the cost of purchasing and owning a timeshare interest. (*Id.* at 11.) Former Wyndham employees testified that the "rental pitch" was used extensively by Wyndham salespeople and that "higher ups" in the company were well aware of the practice, (*Id.* at 14,) and that salesmen were specifically instructed to use the "rental pitch" and promises of rental income when speaking to buyers. (Doc. 123-4 at 26.)

Wyndham owners who accumulate a certain amount of points are eligible for membership in the FairSharePlus VIP Program ("VIP Program"), which offers special

---

[3] Unless otherwise noted, pinpoint citations refer to CM/ECF document stamp pagination.

benefits. Each successive membership level offers greater benefits than are available at lower levels. VIP benefits are particularly advantageous to owners like the Plaintiffs who use their points to operate vacation rental businesses, and the continued existence of the VIP membership benefits has a tangible effect on the profitability of such businesses.

Wyndham published a yearly members directory, which detailed the benefits available to Wyndham owners and the membership rules for the program. The members directory is a lengthy publication with hundreds of pages. Included within each directory is a table outlining the VIP Program benefits available to VIP owners. In 2003, Wyndham placed a small-print disclaimer at the bottom of the VIP Program benefits table which provided that benefits were subject to change without notice. This was again modified in 2006 to say that benefits were subject to change or elimination without notice. Mr. Spearman has acknowledged receipt of the member directory every year.

Wyndham was aware that the Plaintiffs were using their points to operate a for-profit rental business, and the Plaintiffs' situation was discussed among several upper level Wyndham employees. However, when making purchases from Wyndham, Plaintiffs signed documents stating that the purchases were made "for our own personal vacation use and enjoyment," (Doc. 77-36 at 4; Doc. 77-37 at 7; Doc. 77-38

at 5; Doc. 77-39 at 4,) and that Wyndham did not guarantee to assist in the rental of Plaintiffs' points. (Doc. 77-36 at 4; Doc. 77-37 at 7; Doc. 77-38 at 5; Doc. 77-39 at 4.) The contract documents also provided that any representations made outside of a delineated list of documents could not be relied on and were not part of the purchase agreement. (Doc. 77-36 at 4; Doc. 77-37 at 7; Doc. 77-38 at 5; Doc. 77-39 at 4.)

As early as 2005, Wyndham began to notice problems associated with allowing a group of large point owners, sometimes referred to as "Megarenters," [4] to run large rental businesses using Wyndham points. A Wyndham internal presentation from 2005 noted that the company supported owners running rental businesses at the time, but recommended limiting transactions and tightening rules because of the negative effects Megarenters were having on Wyndham's business. A March 2006 presentation recommended altering many of the VIP Program benefits, such as limiting the number of free guest confirmations available to VIPs, changing the VIP cancellation policy, and limiting the ability of VIPs to upgrade their rooms, in order to deal with the problems created by Megarenters.

Many of these changes were actually implemented on July 15, 2006. Among

---

[4] Wyndham employees sometimes used the term "Megarenter" to describe high-volume owners, such as the Plaintiffs, who used their points to operate rental businesses. The exact origin and scope of the term within Wyndham are unclear, and the Court uses the term within the opinion solely for convenience.

these changes were a change in the upgrade policy from allowing VIP owners to upgrade a reserved unit to the largest available unit to only allowing an upgrade to the next larger unit available. Another change was that VIPs would only receive free guest confirmations if the guest was actually traveling with a VIP member. After hearing about the potential change to the guest confirmation policy,  Mr. Spearman created the Spearman Trust in order to have additional "owners" of his Wyndham Points available to check guests into resorts, and in order to "protect himself" if Wyndham "successfully put [him] out of business with one of these rule changes." (Doc. 77-1 at 13.) However, after outcry from owners Wyndham ultimately decided not to implement the rule change regarding guest confirmations. (*Id.* at 12.)

Wyndham continued to implement rule changes that had the effect of restricting rental activity. In 2007, Wyndham changed the rule giving VIP owners unlimited free guest certificates to one providing a tiered system for VIP owners, starting out with 5 free guest confirmations per year and topping out with 15 free guest confirmations per year for every million points owned for VIP Platinum owners. In 2008, Wyndham made further changes, including a significant increase in the guest confirmation fee for confirmations in excess of the limited complimentary amount, changed the cancellation policy from same day to 15 day, and created a "Do Not Sell" list so that Megarenters would not be taken on tours and marketed to by Wyndham sales

personnel. A Wyndham employee noted in an internal email that these changes were "implemented to impact the profitability of the Megarenter's rental activity." (Doc. 123-31 at 3.)

Sometime in 2010, Wyndham began work on a new computer software system known as "Voyager." The program, which has not yet been implemented, is apparently intended to more strictly enforce the existing rules and close what Wyndham views as loopholes, such as the ability to cancel and then immediately re-book a reservation. (Doc. 123-53, at 4-5.) Wyndham added a provision to the 2011-2012 member directory which stated that "The Program is for a Member's own personal use and enjoyment and not for any commercial purposes." (Doc. 123-75 at 3.) Additionally, an enforcement provision was added, stating that "manipulation of the program rules and/or Wyndham employees to gain an unfair advantage" could result in refusal of services or access to Wyndham services and employees for a duration of time determined at Wyndham's sole discretion. (*Id.* at 4.)

The final relevant change came in 2012. Wyndham points contracts designate a "use year," which is the year long term in which points could be used. Megarenters would intentionally purchase contracts with different use years, so that they would still be able to make use of points gained at the end of one contract's use year on a contract with a different use year. In 2012, Wyndham changed the rules so that all owners who

had contracts with different use years would have all of their contracts converted to a single use year. In Plaintiffs' case, their contracts were all converted to a January-December use year. All of the contracts that Plaintiffs had purchased directly from Wyndham already had a January-December use year, but several of the contracts that the Plaintiffs had purchased from third parties originally had different use years.

Mr. Spearman was not one to suffer in silence what he saw as negative changes. Throughout the period when Wyndham was making these changes to the VIP program benefits, he regularly complained and asserted his distrust of Wyndham through e-mails with Wyndham employees and online message board postings. On Dec. 25, 2008, Mr. Spearman posted that then Wyndham VP Deanne Gabel ("Gabel") had "lied at least three times" about guest certificates, and said he could only recall one thing in the recent past about which Gabel had been completely truthful. (Doc. 77-17 at 6-7.) On Feb. 27, 2009, Mr. Spearman made an online post about "Wyndham taking draconian measures to limit your ability to rent" points. (Doc. 77-13 at 3.) On Jan 22, 2009, he posted that Wyndham was "trying to eliminate their competition to rent timeshares." (Doc. 77-15 at 2.) On Feb. 28, 2009, Mr. Spearman posted that "Wyndham is destroying what we own." (Doc. 77-18 at 2.) In 2008, he wrote in an e-mail to Gabel that he was "starting to join the conspiracy theory that there are elements within Wyndham that are purposely trying to make large [owners'] lives

difficult," (Doc. 77-29 at 2), and in another email that he " would be hiding as well if I were an honorable person who was the fall guy for a crooked company." (Doc. 77-32 at 2.) Mr. Spearman was in regular contact with Gabel, who assisted him with account issues on multiple occasions, and informed him that if he filed a lawsuit against Wyndham she would no longer be able to work with him directly and he would have to contact her only in writing.

Plaintiffs filed this lawsuit on November 18, 2011.

II.    Standard

Summary judgment is appropriate " if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is " material" if it " might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). There is a " genuine dispute" as to a material fact     " if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. The trial judge should not weigh the evidence but must simply determine where there are any genuine issues that should be resolved at trial. *Id.* at 249.

In considering a motion for summary judgment, trial courts must give deference to the non-moving party by " considering all of the evidence and the inferences it may yield in the light most favorable to the nonmoving party." *McGee v. Sentinel Offender*

*Services, LLC*, 719 F.3d 1236, 1242 (11th Cir. 2013) (citing *Ellis v. England*, 432 F.3d 1321, 1325 (11th Cir. 2005)). In making a motion for summary judgment, " the moving party has the burden of either negating an essential element of the nonmoving party's case or showing that there is no evidence to prove a fact necessary to the nonmoving party's case." *Id.* Although the trial courts must use caution when granting motions for summary judgment, " [s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole." *Celotex Corp. v. Catrett*, 477 U.S. 317, 327, 106 S. Ct. 2548, 2555 (1986).

III.    Discussion

Wyndham asserts that summary judgment is due to be granted on each of the Plaintiffs' claims because they all fail for various procedural or substantive reasons. Each of the Plaintiffs' claims will be addressed below.

A.    Fraud

The Plaintiffs allege that Wyndham committed fraud by representing that the Plaintiffs would be able to rent their points, earn enough money doing so to cover their expenses, start a rental business with their points, and have the support of Wyndham's systems and facilities in running a rental business. The Plaintiffs argue that these representations were fraudulent because Wyndham was actively working against Megarenters through their " Megarenter strategy"  and its plans concerning

"Voyager," and ultimately altered the Membership Directory to state that points could not be used for any "commercial purpose," which the Plaintiffs argue forbids their rental business.

The necessary elements of a fraud claim are as follows: "(1) there must be a false representation; (2) the false representation must concern a material existing fact; (3) the plaintiff must rely upon the false representation; and (4) the plaintiff must be damaged as a proximate result." *Jarrard v. Nationwide Mut. Ins. Co.*, 495 So. 2d 584, 586 (Ala. 1986). Expressing an opinion is not treated "as a statement of 'existing fact' under the fraud statute," unless the plaintiff supplies proof of an intent to deceive at the time the statement was made. *Crowne Investments, Inc. v. Bryant*, 638 So. 2d 873, 877 (Ala. 1994). Similarly, when the alleged misrepresentation relates to a future event, to constitute fraud the plaintiff must show that "at the time the statement or promise about the future was made, there was actual fraudulent intent not to perform the act promised and intent to deceive plaintiff." *D.H. Holmes Dept. Store v. Feil*, 472 So. 2d 1001, 1003 (Ala. 1985). The failure to perform a promised act "is not in itself evidence of intent to deceive at the time a promise is made." *Id.* "Speculation is insufficient to prove that a party had a present intent to deceive." *McCutchen Co. v. Media General, Inc.*, 988 So. 2d 998, 1003 (Ala. 2008).

In *Fincher v. Robinson Bros. Lincoln-Mercury, Inc.*, 583 So. 2d 256, 258 (Ala. 1991),

the Alabama Supreme Court addressed statements made by a car salesman who sold the plaintiff on a yet to be released car. Although the car was not available for sale at the time, the salesman told the plaintiff that the car was a "fine car," well-suited for the plaintiffs purposes, and that the car was dependable and reliable. *Id.* The Alabama Supreme Court determined that these statements were "statements of opinion amounting to nothing more than 'puffery' or predictions concerning the anticipated performance of" the car, and therefore the plaintiff had failed to make out a fraud claim. *Id.* at 259.

The *McCutchen* case involved the sale of advertising, where the seller told the plaintiff that he could expect at least 50 new clients per month from the purchase of the advertising package. 988 So. 2d at 1000. The sales person admitted that the statement could induce someone to enter into the advertising contract, and her supervisor testified that he could see no other reason to make such a statement other than to induce the buyer to enter into the contract. *Id.* The court found that this statement was not a misrepresentation of a material fact but a statement of opinion or prediction as to future events. *Id.* at 1002. The court also found no evidence of intent because the defendants' admissions did not "demonstrate that [the sales person] thought the statement was untrue or that she had a present intent to deceive when she made the statement." *Id.* at 1003. *See also D.H. Homes Dept. Store*, 472 So. 2d at 1004

(statement that a treatment would effect a permanent removal of plaintiffs' facial hair related to a future event, and the treatments failure to successfully do so was not evidence of a present intent to deceive when the statement was made.)

In the case at hand, it is clear that when the representations were made to the Plaintiffs in 2003-2006 they were accurate statements of fact, because the Plaintiffs did indeed start a business renting out their points using Wyndham's systems. These statements can only be actionable fraud to the extent that they told the Plaintiffs that they would be able to run a rental business using Wyndham's systems in the future. Such representations clearly relate to future events and therefore to make out a prima facie case the Plaintiffs must provide evidence of  intent to deceive at the time the statements were made.

The Plaintiffs argue that Wyndham's internal sales policies prohibiting the " Rental Pitch," the inclusion of the " no commercial purpose" language in the 2011-2012 membership directory, statements by Wyndham that the program was always intended for a member's personal use and not for commercial purposes, and the fact that the representations were made at the same time as the " Megarenter strategy" and Project Voyager were being developed, demonstrate such an intent to deceive. These arguments will be addressed in turn.

First, both parties agree that the sales policies forbidding the use of the " Rental

Pitch" were in place to prevent Wyndham's timeshares from being classified as securities and becoming subject to securities regulations. (Doc. 123-13 at 10-11; Doc. 123 at 10.) The " Rental Pitch" was not forbidden by Wyndham because Wyndham or its employees believed it was false. Therefore the existence of these policies provides no evidence of intent to deceive for the purpose of proving Plaintiffs' fraud claim.

Turning now to the " no commercial purpose" language, the inclusion of this language in the 2011-2012 member directory cannot possibly establish a present intent to deceive when the representations were made in 2003-2006 because it happened a number of years afterward. However, the Plaintiffs also point to statements by Wyndham that the program was always intended to be for personal use and not for commercial purposes. As an initial matter, the representations were not false at the time they were made as evidenced by the fact that the Plaintiffs did run a profitable rental business with the support of Wyndham's systems from 2003 to 2006. Second, the mere fact that Wyndham intended the program to be for personal use, rather than commercial purposes, does not establish that Wyndham's sales personnel intended to deceive the Plaintiffs' by informing them that they could run a rental business with the support of Wyndham's systems. This is especially true because the Plaintiffs were able to run a business renting out their points with the help of Wyndham's systems from 2003, when they made their initial purchase of Wyndham points, up until the present

day, (Doc. 77-1 at 37,) and that the business has been profitable every year. (Doc. 77-1 at 127.)

Finally, the "Megarenter strategy" and Project Voyager also fail to establish an intent to deceive at the time the representations were made. Work did not begin on Voyager until 2010, years after the relevant statements were made by Wyndham's sales personnel. Wyndham was formulating a "Megarenter strategy" beginning in 2005, but the Plaintiffs' own extensive evidentiary submissions make it clear that this was an evolving, changing strategy. According to the Plaintiffs submission, the Megarenter strategy developments were a reaction to the Plaintiffs' conduct in successfully running a rental business with their points. There is no evidence that in 2006, when the last of the relevant representations was made, that the Megarenter strategy was intended to shut down rental by owners; rather, at that point the strategy only involved changing the rules of the program to help reduce the perceived problems created by Megarenters. Therefore, the existence of this strategy does not establish an intent to deceive at the time the representations were made.

The Plaintiffs have failed to provide any proof of the falsity of the representations when they were made or a present intent to deceive at that time, and therefore have failed to make out a prima facie case of fraud. In fact, the Plaintiffs continue to successfully rent out points using Wyndham's systems. (Doc. 77-1 at 37.)

The Plaintiffs have produced less evidence of intent to deceive than the unsuccessful plaintiffs in *McCutchen* and *D.H. Homes Dept. Store*, who were at least able to show that the statements concerning future events proved to be ultimately untrue. The Plaintiffs have failed to make out a prima facie case of fraud, and therefore summary judgment is due to be granted concerning this claim.

B.     Suppression[5]

The Plaintiffs also assert a claim for fraudulent suppression. They argue that the relationship between the Plaintiffs and Wyndham required Wyndham to disclose its intent to eliminate or reduce the benefits offered under the VIP program, to study Megarenters and implement specific program changes designed to target them, and to prevent Plaintiffs from being able to run their business within Wyndham's systems. To make out a valid claim, the Plaintiffs must show "(1) a duty on the part of the defendant to disclose facts; (2) concealment or nondisclosure of material facts by the defendant; (3) inducement of the plaintiff to act; (4) action by the plaintiff to his or her injury." *Freightliner, L.L.C. v. Whatley Contract Carriers, L.L.C.*, 932 So. 2d 883, 891 (Ala. 2005) (quoting *Lambert v. Mail Handlers Benefit Plan*, 682 So. 2d 61, 63 (Ala.

---

[5] Both Wyndham and the Plaintiffs do not make separate arguments concerning the merits of the suppression claim apart from their general arguments on the fraud claims. However, because there are different requirements for a fraudulent suppression and fraudulent misrepresentation claim, the Court will address them separately.

1996)). " The obligation to communicate may arise from the confidential relations of the parties or from the particular circumstances of the case." Ala. Code § 6-5-102. When looking to the " circumstances of the case" to determine whether there is a duty, the court should look to " (1) the relationship of the parties; (2) the relative knowledge of the parties; (3) the value of the particular fact; (4) the plaintiff's opportunity to ascertain the fact; (5) the customs of the trade; and (6) other relevant circumstances." *Bethel v. Thorn*, 757 So.2d 1154, 1162 (Ala. 1999) (quoting *State Farm Fire & Cas. Co. v. Owen*, 729 So.2d 834, 842-43 (Ala. 1998)). The existence of a duty is a legal question to be determined by the trial court. *Ex Parte Farmers Exchange Bank*, 783 So.2d 24, 27 (Ala. 2000). " Superior knowledge of a fact, without more, does not impose upon a party a legal duty to disclose such information." *State Farm Fire and Cas. Co. v. Owen*, 729 So.2d 834, 843 (Ala. 1998). If no special relationship or circumstance creates a duty to disclose, " no duty to disclose exists when information is not requested." *Bank of Red Bay v. King*, 482 So.2d 274, 285 (Ala. 1985). However, if a party undertakes to speak, even without a duty, he or she must also " disclose those facts that are material to the ones already stated so as to make them truthful." *Freightliner*, 932 So. 2d at 895. At the same time, the party " does not assume a duty to divulge all information that *may be* or *may become* relevant to the other party." *Id.* (emphasis in original).

The initial question in the analysis of this suppression claim is whether Wyndham owed the Plaintiffs a duty to disclose information about their plans concerning Megarenters. The relationship between a timeshare salesman and his or her customers is not a confidential relationship. *See Sirmon v. Wyndham Vacation Resorts, Inc.*, 922 F.Supp.2d 1261, 1286 (N.D.Ala. 2013) (finding no confidential relationship in a similar case between Wyndham and another customer; therefore, the duty to disclose must arise out of the "circumstances of the case").

The analysis of these circumstances begins by looking at the relationship of the parties. While the parties were not in a confidential relationship, they still interacted with each other regularly—the Plaintiffs made regular use of Wyndham's systems and personnel in order to run their rental business, and the evidence establishes that Mr. Spearman was in regular e-mail and phone contact with various Wyndham personnel such as Gable. At the same time, the evidence makes clear that the Plaintiffs distrusted Wyndham from the very start of their relationship. Mr. Spearman stated that he became skeptical of Wyndham after his first purchase (which he rescinded, because he believed he had been tricked into it by the salesman), and that his skeptical attitude towards Wyndham increased as time went on. (Doc. 77-1 at 35.) The evidentiary record provides many examples of this skepticism, such as calling Wyndham a "crooked company" on October 10, 2008, (Doc. 77-32 at 2) and expressing a belief

that Gabel was lying to owners on Dec. 25, 2008. (Doc. 77-17 at 6-7.)  Finally, the last time the Plaintiffs purchased points directly from Wyndham was in 2006, and the Plaintiffs acknowledge that at some point they were put on a "Do Not Sell" list, meaning Wyndham specifically instructed its sales personnel not to attempt to sell the Plaintiffs further contracts. (Doc. 77-1 at 75.) While Mr. Spearman also testified that despite being told he was on a "Do Not Sell" list, Wyndham sales personnel did attempt to take him on further sales tours several times, he also testified that he refused these offers. (*Id.*) Thus, while the Plaintiffs and Wyndham maintained an active, longstanding relationship that was closer than the ordinary relationship between a buyer and a seller, the Plaintiffs were at the same time very skeptical towards Wyndham, and Wyndham in fact stopped actively selling to the Plaintiffs.

The next consideration is the relative knowledge of the parties. As the allegedly suppressed information relates to internal Wyndham plans, Wyndham obviously had full knowledge of the suppressed information. However, the Plaintiffs were not oblivious to Wyndham's plans to target Megarenters and alter the program and benefits in order to hinder them. For instance, Mr. Spearman wrote in e-mails to Gabel that he was starting to believe that people at Wyndham were "purposely trying to make large [owners'] lives difficult," (Doc. 77-29 at 2,) and that following the rule changes in 2006 she had told him that she would "continue to monitor owners who

work within the loopholes and try to 'stay ahead of them' with additional changes as necessary." (Doc. 123-76 at 7.) Mr. Spearman also made online posts that he " believed Wyndham was purposefully making rental more difficult for owners in favor of its own rental arm," (Doc. 77-14 at 3,) and that Wyndham was " 'cracking down' on owners like [the Plaintiffs]." (Doc. 77-15 at 2.) This evidence, and Plaintiffs' further e-mail and online posting history, demonstrate that the Plaintiffs had some knowledge, or at least belief, that Wyndham had a plan or intent to harm megarenters. While Wyndham undoubtedly had superior knowledge of their own internal plans, this was not a situation where the Plaintiffs were completely in the dark.

The next consideration is the value of the facts allegedly suppressed. If, as the Plaintiffs contend, Wyndham has plans to completely eliminate Megarenters' businesses, this would obviously be very valuable information to the Plaintiffs, who possess more Wyndham points than they could ever use for their own vacation use alone.

The final applicable consideration is the Plaintiffs' ability to discern the undisclosed information. The Plaintiffs would likely not have been able to determine the full extent of Wyndham's plans through independent investigation or research. However, the Plaintiffs were able to determine the existence of a general anti-Megarenter scheme from the comments Wyndham made about large owners

"hoarding" inventory and causing problems, (Doc. 77-1 at 56; Doc. 77-9 at 3,) and the many rule changes that the Plaintiffs believed, even at the time, were intended to limit owners' rental ability in favor of Wyndham's own rental arm. (Doc. 77-14 at 3; Doc. 77-3 at 3.) Moreover, the Plaintiffs signed documents along with each of their purchases from Wyndham that stated the purchases were for "personal vacation use and enjoyment," and acknowledged that Wyndham did not guarantee to assist in the rental of owners' points. (Doc. 77-36 at 4; Doc. 77-37 at 7; Doc. 77-38 at 5; Doc. 77-39 at 4.) This language is very similar to the language in the 2011-2012 member directory, stating that the program was for a "Member's own personal use and enjoyment and not for any commercial purposes" that the Plaintiffs argue demonstrates Wyndham's intent to eliminate rental activity. While Plaintiffs may have lacked the ability to independently discover the full extent of Wyndham's plans, they were able to discover the general existence of a scheme by Wyndham to limit owners' rental activity.

After considering these factors, it is evident that the relationship between the parties in this case does not create a legal duty to disclose on the part of Wyndham. Therefore, the Plaintiffs can only make out a claim of suppression if they made a direct inquiry on the subject to Wyndham, or Wyndham voluntarily undertook to speak in a way that required full disclosure.

The Plaintiffs argue that Mr. Spearman asked direct questions of Wyndham

on this subject, but they do not point to any evidence in support of this assertion. Plaintiff's evidentiary submissions do contain Gabel's deposition, which states that at a meeting with Mr. Spearman in May of 2006 she informed him that there would be "no surprises and no changes that would adversely affect [his] ownership." (Doc. 123-14 at 15.) However, the changes that were currently planned at that point in time were actually instituted a few months later, and therefore even if this constituted fraudulent suppression in response to a direct question by Mr. Spearman (a conclusion which on its own would require the Court to make several inferential leaps from the available evidence), Mr. Spearman should have discovered the fraud when the rule changes were instituted. In that case, the two year statute of limitations on a suppression claim, a defense plead and argued by Wyndham, would have run long before the instant action was filed. *See* Ala. Code § 6-2-38(l) (fraudulent suppression has a two year statute of limitations).

The Court was only able to discover a few further pieces of evidence in the Plaintiffs' voluminous evidentiary submission that could lend any support to the idea that Mr. Spearman asked a direct question on this subject, or that Wyndham undertook to speak. A June 13, 2005 email from Mr. Spearman states that Gabel suggested that he take a "wait and see" approach in response to his concerns over Wyndham's approach to VIP benefits. (Doc. 123-77 at 5.) The Plaintiffs also point to

an August 4, 2010 email from Gabel to Spearman, in response to Mr. Spearman complaining about Wyndham call centers, stating that Project Voyager would fully automate Wyndham's service, which would in turn improve consistency and "ensure improved service for our owners." (Doc. 123-61 at 2.) This evidence simply does not support the assertion that Mr. Spearman ever made a direct inquiry that would require Wyndham to fully disclose any of its plans. Additionally, neither of the statements made by Gabel are of the sort that would constitute an affirmative undertaking to speak thus requiring full disclosure. To hold otherwise would be to require a speaker to affirmatively disclose the full details of anything he or she happens to reference anytime it could have an effect on the listener. This is especially true in the case of the Voyager email, which was sent in August of 2010 during the early stages of Project Voyager, which has still not actually been implemented.

Under the circumstances of this case, Wyndham did not have a duty to inform the Plaintiffs of its plans and intent to make changes in order to limit and control rental activity. The evidence also does not establish that the Plaintiffs ever made direct inquiries or that Wyndham undertook to speak in a way that could also have established a duty of full disclosure. Finally, even if a duty to disclose did exist, the evidence shows that the Plaintiffs continue to profitably rent out their points, (Doc. 77-1 at 127,) and therefore the only evidence available as to damages, one of the

required elements of a fraudulent suppression claim, are conclusory statements by the Plaintiffs that their points have lost value or that their profits are lower than in the past. Therefore, Plaintiffs have failed to make out a prima facie case of fraudulent suppression and summary judgment is due to be granted on the Plaintiffs suppression claim.

C.    Negligence; Wantonness; and Negligent and Wanton Hiring, Training, and Supervision Claims[6]

The Plaintiffs allege that Wyndham's actions of making changes to actively damage Megarenters, engaging in deceptive sales tactics, and failing to follow its own internal sales procedures were negligent and wanton. They also allege that Wyndham negligently and wantonly failed to exercise reasonable care in the hiring, training, supervision and retention of its employees.

Wyndham contends that all of the Plaintiffs' claims based on negligence and wantonness are barred by the statute of limitations. Alabama provides a two year statute of limitations for each of these claims. Ala. Code § 6-2-38(l). Therefore, if the Plaintiffs' claims are based on injuries that accrued prior to November 18, 2009, they

---

[6] In Defendants' motion for summary judgment, as well as the Plaintiffs' response and the Defendants' reply, the parties also discuss unjust enrichment and civil conspiracy claims that were included in the Plaintiffs' initial complaint. However, after the initial filing of the Defendants' motion for summary judgment the Plaintiffs' filed an amended complaint, (Doc. 116), which dropped those causes of action, and therefore they will not be discussed by this Court.

are barred by the statute of limitations.

The Plaintiffs argue that the savings clause of Ala. Code § 6-2-3 saves these claims. This savings clause states that a fraud claim is not considered to have accrued until the aggrieved party has discovered the acts constituting the claim. While the statute on its terms only applies to fraud claims, the Alabama Supreme Court has held that § 6-2-3 also applies to other claims where the defendants fraudulently conceal the existence of the cause of action from the aggrieved party. *DGB, LLC v. Hinds*, 55 So. 3d 218, 224 (Ala. 2010); *see also Holdsbrooks v. Central Bank of Ala., N.A.*, 435 So.2d 1250, 1251 (Ala. 1983).

The Plaintiffs only argument against the statute of limitations on these claims is that the following facts were concealed from them by Wyndham until discovery in the *Sirmon* case, thus tolling the statute of limitations: the existence and violation of Wyndham's internal sales manuals; Wyndham training its employees to lie to make sales; the existence of the Megarenter strategy to eliminate Megarenters; and the Voyager Projects' functions to control inventory and stop the cancel/rebook option to further this elimination of Megarenters. These contentions will be addressed in turn.

First, there is the matter of Wyndham's internal sales manuals.   Under Alabama law, a duty can be created out of a company's own internal policies, but the Alabama

Supreme Court has found this to be the case only where " the duty that supported the negligence claim was a common-law duty arising from the foreseeability of physical harm resulting from the defendant's failure to follow its policies concerning the safety of the public." *Armstrong Bus. Serv., Inc. v. AmSouth Bank*, 817 So.2d 665, 680 (Ala. 2001). However, when the policy is intended for the company's own benefit rather than for the safety of the public, no cognizable duty to follow the policy is created. *Id.* at 681; *see also Flying J Fish Farm v. Peoples Bank of Greensboro*, 12 So.3d 1185, 1194-95 (Ala. 2008) (no duty where bank's policies are intended solely for the bank's benefit). In this case, according to both Plaintiffs and Wyndham, the relevant policies forbidding using rental or potential rental income as part of the timeshare sales pitch were in place so that the timeshares would not be considered securities and therefore regulated under stringent securities regulations. (Doc. 123-13 at 10-11; Doc. 123 at 10.) Avoiding classifying Wyndham's timeshares as securities is clearly to Wyndham's benefit, and is not intended to benefit the Plaintiffs or protect the public from harm. Therefore, no duty is created in Wyndham to follow that policy, no tortious liability is created by Wyndham's failure to do so, and the fact that the Plaintiffs were unaware of the internal sales policy manual has no effect on the statute of limitations.

Second, the Plaintiffs' online posting history demonstrates that they have long been aware of the fact that Wyndham's representatives were lying in order to make

sales. On Mar. 11, 2009, Mr. Spearman posted that he had considered taking a job with in-house sales at a nearby resort, but turned the offer down because Mrs. Spearman told him that " the sales manager made a living at promises backed with only lies." (Doc. 77-6 at 3.) On Jan. 12, 2009, he posted that " [t]he 'Statement of Understanding' is the legal size two-page list of about 40 items that we affirm that we understand, even though many of them are specifically written to inform us that what our salesman told us are lies." (Doc. 77-16, at 2.) On Feb. 28, 2009, he warned another online poster that Wyndham salesmen would " take a testimonial like what [he] just said and lie to you to make it seem like it is the norm." (Doc. 77-18, at 2.) These postings make clear that the Plaintiffs already believed that Wyndham salesmen lied in making their sales pitches. While Plaintiffs may not have believed that Wyndham's salesmen were specifically trained to tell lies, they were certainly aware that the salesmen in Plaintiffs' opinion told lies to make sales, which is all that is required for any of these actions to begin to accrue. Therefore, this also does not prevent the statute of limitations from having run.

Third, as discussed above in part III.A.1, *supra*, while Plaintiffs may not have been aware of the specific term " Megarenter strategy," they certainly repeatedly expressed a belief that Wyndham had a strategy in place to harm Megarenters more than two years before they filed this action. Therefore, the fact that the Plaintiffs were

unaware of the name " Megarenter strategy" or the exact details of Wyndham's plan does not prevent the statute of limitations from having run under the § 6-2-3 savings clause.

The Plaintiffs' final argument against the statute of limitations on this group of claims is Wyndham's " Project Voyager," and the new functions it will implement to control inventory and prevent the cancel/rebook feature that is a particularly useful part of the Plaintiffs' rental business model. However, the Plaintiffs make it clear that Voyager has not yet been implemented, and will be implemented sometime in " 2014/2015." (Doc. 123 at 32; Doc. 123-65 at 2). As pointed out by Wyndham, the anticipation of a possible future development is not enough to overcome the statute of limitations.

Because the Plaintiffs filed these claims outside of the applicable limitations period, they will only go forward if Wyndham is estopped from asserting the statute of limitations as a defense. When determining whether a defendant is estopped from asserting the statute of limitations as a defense, the Court must " balance the purpose of the statute of limitations with the injustice that would result from allowing the defendants to claim it as a defense." *City of Birmingham v. Cochrane Roofing & Metal Co., Inc.*, 547 So.2d 1159, 1167 (Ala. 1989). The Supreme Court of Alabama has summarized the law applicable to determining whether a party is equitably estopped

from asserting the statute of limitations as a defense in this way:

> In *Mason v. Mobile County*, 410 So.2d 19 (Ala. 1982), this Court held that if a defendant either fraudulently or innocently represents to the plaintiff that he will remedy a problem, and relying on these representations the plaintiff is induced not to file a lawsuit or take any action, the defendant may be estopped from raising the statute of limitations as a defense. Additionally, in *Arkel Land Co. v. Cagle*, 445 So.2d 858 (Ala. 1983), we held that if a defendant represents that a lawsuit is unnecessary because he intends to take care of the problem he is likewise estopped from raising the statute of limitations as a defense.

*Cochrane Roofing*, 547 So. 2d at 1167. The type of action which is sufficient to prevent a defendant from asserting the statute of limitations "must amount to an affirmative inducement to the claimant to delay bringing action." *Seybold v. Magnolia Land Co.*, 376 So.2d 1083, 1085 (Ala. 1979). The Court must also apply a "standard of reasonableness" to these estoppel principles, looking to see whether a reasonable person would have allowed the statute of limitations to expire based on the defendant's actions. *Cochrane Roofing*, 547 So. 2d at 1167; *see also McCormack v. AmSouth Bank, N.A.*, 759 So.2d 538, 543 (Ala. 1999).

In *Mason v. Mobile County*, the plaintiffs failed to sue based on alteration to a drainage ditch that resulted in flooding to their home because the County assured them that the problem would be fixed. 410 So.2d at 20. The Alabama Supreme Court determined that the County was estopped from asserting the statute of limitations as a defense because it had represented that it would correct the problem, and the

plaintiffs had relied on those representations in choosing not to file a lawsuit. *Id.* at 21.

Similarly, in *Sirmon*, the plaintiff made multiple complaints about the loss of his VIP

benefits. 922 F.Supp.2d at 1278. Wyndham's representatives responded with false

promises that the benefits would be restored, and responded to a demand letter

threatening legal action by promising that Wyndham would come up with a "complete

collaborative response" after "substantial amounts of research." *Id.* After plaintiff

agreed to wait for this response, an internal Wyndham email said that they had

"bought some time" with the plaintiff. *Id.* In *Sirmon*, this Court determined that these

representations provided evidence of the defendant's motive to lull the plaintiff into

not filing a lawsuit. *Id.*

The plaintiffs in *Moore v. Nat'l Sec. Ins. Co.*, 477 So.2d 346, 347 (Ala. 1985)

attempted to purchase additional life insurance coverage on their already existing

policies but were instead sold brand new policies by their agent. Because the plaintiffs

were unaware that they had been sold new policies, they ceased making payments on

their already existing policies, causing them to lapse. *Id.* When the plaintiffs finally

discovered the error and spoke to their insurance company about it, they were told by

multiple people that company employees were "checking into the problem." *Id.* No

corrective action was ever taken by the insurance company, but the plaintiffs did not

bring their fraudulent concealment suit against the company until two years later, after

the statute of limitations had already run. *Id.* at 348. The Alabama Supreme Court determined that the defendants were not estopped from asserting the statute of limitations because the defendants "never assured [the plaintiffs] they would receive all they believed they were entitled to receive" and had only given the plaintiffs "vague assurances and did not affirmatively induce" them to inaction. *Id.*

The Plaintiffs argue that Wyndham should be estopped from asserting the statute of limitations as a defense because of Mr. Spearman's testimony and emails showing that Gabel had helped him in the past, had informed him that if he brought a lawsuit any further communication with her would have to be in writing, and had told Mr. Spearman that she could not directly help him with his account any longer if he brought a lawsuit. Mr. Spearman also testified that Gabel had "made it very clear without coming right out and saying [Wyndham] is going to destroy your business if you contact a lawyer or have a lawsuit against us." (Doc. 77-1, at 72.)

These statements more closely resemble the "vague assurances" of *Moore* than the affirmative inducements of *Mason* and *Sirmon*. A statement that Wyndham's representative would no longer be able to interact as freely with and provide special assistance to Mr. Spearman should he bring a lawsuit is not a threat or an affirmative attempt to get him to forego a lawsuit. Rather, it is a statement of the reality that the relationship between parties changes when one of them brings a lawsuit against the

other, especially when the defendant is a large corporation with a legal department that would have an interest in controlling what the defendant's representatives says after a lawsuit is initiated. Finally, Mr. Spearman's impression that Wyndham would "destroy" the Plaintiffs if they ever brought suit, even if it rose to the level of an "affirmative representation," could not have been reasonably relied upon by the Plaintiffs. The Plaintiffs' suit is already essentially based upon the idea that Wyndham's actions were destroying his rental business. Therefore it was not reasonable to delay bringing suit upon those actions because of an impression, based upon unidentified statements, that Wyndham would destroy his business if he brought suit. Therefore, Wyndham's motion for summary judgment is due to be granted with respect to Plaintiffs' claims for negligence, wantonness, and negligent and wanton hiring, training, and supervision.

> D.   Breach of Contract

The Plaintiffs contend that Wyndham breached a contract by unilaterally altering the "use years" on several of their contracts.[7] In order to sustain this breach of contract claim, the Plaintiffs must prove: "(1) the existence of a valid contract

---

[7] The Plaintiffs are also seeking a judicial declaration that Wyndham does not have the right to unilaterally change the "use year" in the Plaintiffs' contracts. Because this question is obviously closely related to whether Wyndham committed a breach of contract by changing the "use year," and neither party has addressed the declaratory judgment claim in relation to summary judgment, that claim will either stand or fall with the breach of contract claim on summary judgment.

binding the parties in the action, (2) his own performance under the contract, (3) the defendant's nonperformance, and (4) damages." *Ex parte Alfa Mut. Ins. Co.*, 799 So. 2d 957, 962 (Ala. 2001) (internal quotation marks omitted). Wyndham argues that summary judgment is proper on the breach of contract claim for three reasons: because Plaintiffs fail to cite to a breached contractual provision in a contract between the Plaintiffs and Wyndham, because the Plaintiffs fail to include sufficient facts regarding damages, and because the Plaintiffs fail to allege their own performance.

As a general matter, contract rights may be freely assigned unless an assignment would add to or materially alter the duties or risks undertaken by the parties, the assignment would violate a statute, or something in the contract restricts assignability. *See Stuart v. Ennis*, 482 So. 2d 1168, 1171 (Ala. 1985). Wyndham contends that Plaintiffs are unable to cite to any contractual provision that has been violated in any contract between the Plaintiffs and Wyndham, because the "use year" on the contracts Plaintiffs purchased directly from Wyndham have always been and still remain from January to December. While this appears to be correct, the Plaintiffs' other contracts, some of which had their use years altered, were bought on the resale market from third parties. There is no apparent reason—and Wyndham has not provided any—why these timeshare contracts, purchased from third parties, should not be assignable, as almost all contracts are; or why the Plaintiffs' purchase of the

contract from a third party did not assign to the Plaintiffs the right to sue upon a breach of that contract.

Wyndham also argues that, because the Plaintiffs have been unable to produce the actual timeshare contracts that form the basis of the third party contracts, Plaintiffs' claim fails in that they are unable to point to a specific contractual provision that Wyndham breached. The Defendants are correct that neither party has been able to produce any actual contracts that have had their use year changed. However, the Plaintiffs have produced evidence supporting the existence of a such a contractual term. Among other things, the Plaintiffs have provided a deposition wherein a Wyndham employee stated that all contracts have a "use year" after which their points expire. (Doc. 123-72 at 212.) They have produced "Transfer of Ownership Acknowledgements" for several contracts in which Wyndham acknowledged that the Plaintiffs were now the owners of contracts purchased from third parties and acknowledging a use year other than January-December. (Doc. 123-84.) They have also provided testimony from Mr. Spearman that all of his contracts were altered to have a January-December use year. (Doc. 77-1 at 79.) Taking all evidence and making all inferences in favor of the non-movant, there is enough evidence for a reasonable jury to determine that there was a term in these contracts, assigned to the Plaintiffs by third parties, that established a use year other than Janurary-December. A reasonable jury

could also determine that Wyndham breached these contracts by unilaterally altering the Plaintiffs' contracts to all have the same use year.

As to Wyndham's contention that Plaintiffs have not shown damages, the Plaintiffs have produced evidence that they lost a significant number of Wyndham points and reservations due to the use year change. (Doc. 77-1, at 80.) A reasonable jury could determine that this economically damaged the Plaintiffs. Finally, there is no evidence in the record that the Plaintiffs have not performed under the contract. Taking all evidence and making all inferences in favor of the non-movant, a reasonable jury could determine that the Defendants have breached a contract they have with the Plaintiffs. Therefore, summary judgment is due to be denied regarding Plaintiffs' breach of contract and declaratory judgment claims.

E.    Injunctive Relief

Plaintiffs also seek an injunction requiring Wyndham to restore the original "use years" to Plaintiffs' contracts and permanently enjoining Wyndham from changing these "use years" in the future. Any motion or suit for an injunction must be based upon a cause of action; an injunction is a type of relief rather than an independent cause of action. *Alabama v. U.S. Army Corps of Engineers*, 424 F.3d 1117, 1127 (11th Cir. 2005). Because an injunction is an "extraordinary remedy, it is available not simply when the legal right asserted has been infringed, but only when that legal right has been

infringed by an injury for which there is no adequate legal remedy and which will result in irreparable injury if the injunction does not issue." *Id.* Therefore, to obtain a permanent injunction, a plaintiff must show: " (1) that he has prevailed in establishing the violation of the right asserted in his complaint; (2) there is no adequate remedy at law for the violation of this right; and (3) irreparable harm will result if the court does not order injunctive relief." *Id.* (citing *Newman v. Alabama*, 683 F.2d 1312, 1319 (11th Cir. 1982)).

Both Wyndham and the Plaintiffs base their arguments on summary judgment solely upon whether the Plaintiffs will succeed on the merits of their breach of contract claim. The Court is allowing the breach of contract claim to move forward, meaning that the Plaintiffs have the potential to succeed on the merits of their claim. While the Court does have questions concerning the inadequacy of a legal remedy or the irreperability of the harm, the Court will also allow the possibility of injunctive relief to move forward and be addressed at the end of the trial. Therefore, summary judgment is due to be denied regarding the Plaintiffs' claim for injunctive relief.

F.    Motion to Strike

Wyndham has also filed a motion to strike portions of the Plaintiffs' undisputed fact section and certain exhibits offered by the Plaintiffs in support of their response to Wyndham's motion for summary judgment. It was unnecessary for the Court to

look to the particular exhibits at issue in the motion in making its decision, and the Court performed an independent examination of the evidence rather than relying on the Plaintiffs' statements of the undisputed facts. Therefore, Wyndham's motion to strike is due to be denied as moot.

IV.    Conclusion

For the foregoing reasons, Wyndham's motion for summary judgment (Doc. 78) is due to be DENIED as to Count I, the claim for breach of contract, Count VIII, seeking declaratory judgment, and Count IX seeking injunctive relief. The motion is due to be GRANTED as to all other counts. Wyndham's motion to strike, (Doc. 129), is due to be DENIED as moot.

A separate order will be entered.

Done this 10th day of November 2014.

L. SCOTT COOGLER
UNITED STATES DISTRICT JUDGE
177825